IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MANO KHAMISSI-SOBI, | |
| | CIVIL ACTION FILE NO. |
| Plaintiffs, | |
| | |
| vs. | JURY TRIAL DEMANDED |
| | |
| MEHRDAD AREFI NEZHAD, CAPITAL DESIGN HOMES, LLC, CDG HOMES, LLC.; MOHAMMAD SEDEHI, MANDA TECHNOLOGY, INC., and JOHN DOES, I–X, | |
| | |
| Defendants. | |

## COMPLAINT

Plaintiff **MANO KHAMISSI-SOBI**, through her counsel, **STEPHEN M. KATZ, THE KATZ LAW GROUP LLC**, alleges:

### NATURE OF THIS ACTION

1.     This is action brought to recover damages and equitable relief under Title II of The Electronic Communications

Privacy Act, 18 U.S.C. § 2701(A)(1), Racketeer Influenced And Corrupt Organizations Act (RICO), 18 USC 1961 et seq., and various state law tort theories, including Georgia Computer Systems Protection Act,  GA. CODE ANN. § 16-9-90, Invasion Of Privacy, Breach Of Fiduciary Duty, Intentional Infliction Of Emotional Distress, Fraud,   Fraudulent Conveyance, and Constructive Trust.

## JURISIDICTION

2.    This Court has jurisdiction over **SOBI**'s claims under 28 U.S.C. §§ 1331, 1367 in that this is an action arising under a federal statute and the state claims are part of a common nucleus of operative facts. 28 U.S.C. § 1367.

## VENUE

3.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) in that her claims arose in the Northern District of Georgia.

## PARTIES

4.    **MANO KHAMISSI-SOBI,** a United States Citizen, lives in the Northern District of Georgia.

–2–

5.      **MEHRDAD AREFI NEZHAD** lives in the Northern District of Georgia. Nezhad can be served by delivering a copy of the summons and complaint to him at 3310 Devaughn Drive, NE, Marietta, Georgia 30066 or 600 Pinnacle Dr., Norcross, Georgia 3007**1.**

6.      **MOHAMMAD SEDEHI** lives in the Northern District of Georgia and can be served by delivering a copy of the summons and complaint to him at 600 Pinnacle Dr., Norcross, Georgia 3007**1.**

7.      **CAPITAL DESIGN HOMES, LLC IS** a Georgia corporation with its principal place of business  at 1235 Hightower Trial, Suite 300, Atlanta, Georgia 30350, which is located in the Northern District of Georgia. **CAPITAL DESIGN HOMES** can be served by delivering a copy of the summons and complaint to its registered agent, Company Services, Inc., at 3500 Lenox Road, Suite 760, Atlanta, Georgia 30326.

8.      **CDG HOMES, LLC IS** a Georgia corporation with its principal place of business  at 1235 Hightower Trial, Suite 300, Atlanta, Georgia 30350, which is located in the Northern District of Georgia. **CDG HOMES** can be served by delivering a

copy of the summons and complaint to its registered agent, Company Services, Inc., at 3500 Lenox Road, Suite 760, Atlanta, Georgia 30326.

9.     **MANDA TECHNOLOGY, INC. IS** a Georgia corporation with its principal place of business in the Northern District of Georgia. Manda can be served by delivering a copy of the summons and complaint to its registered agent, **MEHRDAD AREFI NEZHAD** at 3310 Devaughn Drive, NE, Marietta, Georgia 30066 or 600 Pinnacle Dr., Norcross, Georgia 3007**1.**

10.    **JOHN DOES, I–V JOHN DOES I–X** are persons or entities currently unknown to the plaintiff.

## FACTS

### A.   BACKGROUND

11.    **SOBI**, now 29, is formerly a citizen of the Islamic Republic of Iran and a  member of the Mandaean religion.

12.    Though originally from the Southern Levant, Mandaeans have lived for centuries in in the alluvial plain of what was formerly Lower Mesopotamia and is now Iraq and Iran. Mandaeans also live in Syria and Jordan.

13.     Mandaeans revere certain Biblical figures, such as Adam, Noah, Aram and especially John the Baptist. Mandaeans originally spoke a dialect of Aramaic, but now generally speak Modern Persian and Iraqi Arabic.

14.     **SOBI** immigrated to the United States with her parents in September, 1999, age 16.

15.     At the time she immigrated to the United States, **SOBI** and her family were citizens of the Islamic Republic of Iran but residents of Damascus, Syria where her father and mother worked.

16.     While living in Damascus, **SOBI** and her family suffered discrimination, persecution, and harassment from Sunni and Shia Muslims, including, but not limited to Iranian expatriates living in Damascus.

17.     The United States granted **SOBI**, her father, mother and siblings refugee, and, later, permanent resident status.

18.     In November, 2005, **SOBI** became a naturalized U.S. citizen.

**B.**    **SOBI'S RELATIONSHIP WITH NEZHAD**

19.    In 2005, **SOBI,** then aged 22, visited Ahvaz, Iran to attend the wedding of a friend.

20.    **SOBI** met **NEZHAD'S** sister for the first time at the wedding ceremony in Ahvaz.

21.    **WHILE SOBI** was in Iran, Nezhad's sister attempted to arrange a marriage between **SOBI AND NEZHAD.**    Although arranged marriages are common for Mandaeans, like other Middle Eastern cultures and religions, **SOBI** and her parents initially declined the marriage overture from **NEZHAD'S** sister due to the 15 year age difference between **NEZHAD** and **SOBI**.

22.    Within weeks after **SOBI** returned to the United States from Iran, **NEZHAD** contacted **SOBI** over the Internet, seeking assistance to immigrate to the United States, ostensibly due to discrimination and persecution by the Iranian government.

23.    Based on Nezhad's statements that the Iranian government persecuted him based on his religion, **SOBI** assisted **NEZHAD** in drafting statements describing the alleged persecution. **SOBI** also referred **NEZHAD** to her  aunt in Chicago

for assistance with an application for refugee status in the United States.

24.     Based on **NEZHAD'S** statements that the Iranian government persecuted him, **SOBI'S** aunt assisted **NEZHAD** with his application for refugee status in the United States**.**

25.     **SOBI'S** aunt put **NEZHAD** in touch with the **HEBREW IMMIGRANT AID SOCIETY (HIAS),** a non-profit organization that was originally formed in the early twentieth century to assist Jewish immigrants, but assists individuals of all faiths and cultures with asylum and refugee applications. HIAS runs the U.S. government's Resettlement Support Center, formerly known as the Overseas Processing Entity), in Vienna under a contract with the U.S. Department of State. The RSC helps religious minorities from Iran come to the United States. Funded by the U.S. Department of State, Bureau of Population, Refugees, and Migration (PRM). HIAS provides processing assistance and cultural orientation to U.S.-bound Iranian religious minorities seeking a safe haven from persecution, including Jews, Baha'is, Christians, Zoroastrians, and Sabaean Mandaeans.

26.    While applying for refugee status and permission to enter and work in the United States, **NEZHAD** continued to correspond with **SOBI** through the Internet to persuade her to marry him.

27.    **NEZHAD**'s application for refugee status took over a year. Eventually **NEZHAD** was able to leave Iran. After leaving Iran, **NEZHAD** temporarily lived  under the auspices of the RSC in Vienna, Austria while awaiting permission to enter the United States.

28.    When he arrived in the United States, **SOBI** sponsored **NEZHAD** based on his marriage proposal to her.

### C.    FACTS SUPPORTING ALLEGATIONS OF MARRIAGE FRAUD

29.    **NEZHAD** arrived in Atlanta on May 6, 2006.

30.    At considerable time and expense, **SOBI** rented Nezhad an apartment, furnished the apartment, chauffeured him throughout Atlanta, assisted him in applying for Medicaid and other government benefits such as social security,

translated for him, assisted him in finding a job, and helped him fill out applications to Kennesaw State University to learn English.

31.    After becoming settled in Atlanta, Nezhad became employed as a senior engineer with Beena Vision Systems, Inc. Beena Vision Systems Inc. describes itself as "[t]he leading manufacturer of vision-based automatic wayside inspection systems for the railroad industry." Beena Vision develops and markets sophisticated technologies to railroad industries throughout the United States, Europe, and the Middle East.

32.    On May 9, 2007, **NEZHAD** submitted his application for permanent residence to USCIS.

33.    On August 11, 2007, **NEZHAD** and **SOBI** were married in Atlanta before a Mandaean priest in the presence of 300 guests.

34.    After the wedding, **NEZHAD** and **SOBI** began living together as husband and wife.

35.    Over the next three years, the waiting period for Nezhad to obtain U.S. citizenship, **NEZHAD**'s engaged in conduct which indicated that that he entered into the

relationship with SOBI to immigrate, transfer funds to the United States, and continue operating his technology/telecommunications business in Iran rather than companionship, shared interests, religious identity, procreation, and love:

- **NEZHAD RENEGED ON HIS PROMISE TO BE LEGALLY MARRIED. NEZHAD** refused to obtain a marriage license despite his pre-martial agreement to do before the marriage ceremony and despite numerous post-marital promises to do so;

- **NEZHAD REFUSED TO HAVE OR CONSIDER HAVING CHILDREN DESPITE HIS PRE-MARITAL PROMISE AND AGREEMENT TO START A FAMILY SHORTLY AFTER THE MARRIAGE.** Before the marriage, SOBI made it plain to NEZHAD that she wished to start a family shortly after the marriage based on her culture, love for children,

and strong religious beliefs. Nezhad agreed, but after the marriage refused to have or even consider having children;

- **NEZHAD REFUSED TO HAVE SEXUAL INTERCOURSE WITH SOBI.** Nezhad refused to have marital relations with Sobi. After Sobi demanded that Nezhad fulfill his marital obligations, Nezhad deliberately made **SOBI**'s request for marital relations impossible by demanding that **SOBI** engage in unnatural sex acts and, unbeknownst to **SOBI** at the time, viewing pornography, including pornography depicting teenage girls as well as animals;

**NEZHAD REFUSED TO HAVE "JOINT FINANCIAL RESOURCES"** Refused to have any joint finances, including a joint bank account for household items. **NEZHAD** kept secret banking and other financial accounts and refused to disclose the

nature or even existence of these accounts. **NEZHAD** repeatedly made purchases for himself but not Sobi. For example, **NEZHAD** purchased an automobile, a BMW 530i, in his own name and refused to provide **SOBI** with even minimally adequate automobile;

- **NEZHAD SEVERELY LIMITED SOBI'S CONTACT WITH HER PARENTS, OTHER FAMILY MEMBERS, AND FRIENDS;**

- **NEZHAD REFUSED TO ALLOW SOBI TO MEANINGFULLY PARTICIPATE IN RELIGIOUS OBSERVANCE. NEZHAD** refused to participate or even allow **SOBI** to participate in religious observance with her family despite his pre-marital representations that was an observant member of the Mandaean faith;

- **NEZHAD REFUSED TO ALLOW SOBI TO BE NAMED AS AN OWNER ON THE DEEDS TO**

RENTAL PROPERTIES THEY PURCHASED DESPITE FORCING SOBI TO WORK DAY AND NIGHT SEVEN DAYS PER WEEK ON THE RENTAL HOMES. SOBI performed all tasks related to acquisition, construction, and property management of their rental properties, including, but not limited to frequent manual labor at said rental homes;

- NEZHAD kept secret, encrypted financial and other information and refused to tell SOBI the nature or substance of the information;

- NEZHAD conducted business in the Islamic Republic of Iran despite his sworn statements to the U.S. government that he had not been able to maintain employment or conduct business due to religious discrimination.

Nezhad's conduct toward Sobi is consistent with the factors used by the Department of Homeland Security in identifying marriage fraud under immigration statutes. *See e.g.* 8 CFR part 204.2 Evidence indicating valid marriage includes joint ownership of property, comingling of financial resources, documents relating to children, valid marriage license/certificate issued by state).

36.    In the three year period after the marriage, which was also the waiting period for NEZHAD to obtain U.S. citizenship, the parties acquired real and personal property, including, but not limited to:

(a)    SOBI's residence located at 3310 Devaughn Drive, Marietta, Georgia 30066;

(b)    Rental properties located at

- 218 Timber Creek Lane
  Marietta, Georgia 30060;

- 257 Timber Creek Lane, SW
  Marietta, Georgia 30060;

- 1140 Falling Water Drive
  Smyrna, Georgia 30080;

–14–

- 1233 Ridgecrest Lane
  Smyrna, Georgia 30080;

- 1700 Cumberland Valley Drive
  Smyrna, Georgia 30080;

- 1720 Cumberland Valley Drive
  Smyrna, Georgia 30080;

- 3006 Patnell Place
  Smyrna, Georgia 30080;

- 2795 Northwood Court, SW
  Marietta, Georgia 30060;

(c)   Furniture and other personal property, including, without limitation, valuable and priceless Persian rugs given to **SOBI** as gifts by her family;

(d)   Funds that **NEZHAD** misappropriated during the parties partnership and in breach of **NEZHAD**'s fiduciary duties to **SOBI**.

## <u>THE PARTIES' SEPARATION</u>

37.   In June, 2012 the parties separated and, in or about September, 2012, **SOBI** filed a complaint for divorce against **NEZHAD** with the Superior Court of Cobb County, Georgia.

38.     To avoid disclosing the existence and transfer to the Islamic Republic of Iran of money, technology, and assets acquired during the marriage and in which **SOBI** had an interest, **NEZHAD** claimed that the parties were not and had never been married.

39.     **NEZHAD** claimed that he and **SOBI** had never been married despite

    (a)    swearing or affirming under penalties of perjury in his application for citizenship and he and **SOBI** were married;

    (b)    filing joint tax returns for four years under which he swore or affirmed under penalties of perjury that he and **SOBI** were married;

    (c)    Signing loan applications with federally insured financial institutions in which he stated  under penalties of perjury that he and **SOBI** were married;

    (d)    Completing and signing other financial documents stating that he and Sobi were married.

40.     On February 21, 2013, the Superior Court of Cobb County Georgia entered an order dismissing **SOBI**'s complaint

for divorce, holding that the lack of a marriage license deprived the Superior Court of subject matter jurisdiction.

41.    The Superior Court made no determination as to the existence of a partnership or fiduciary duties between the parties, nor did the Superior Court address the issue of marital fraud.

42.    The Superior Court of Cobb County made no determination regarding the ownership of real and/or personal property or the disposition of property jointly owned by the parties.

### NEZHAD MISAPPROPRIATES FUNDS AND TRANSFERS THE MONEY TO IRAN IN VIOLATION OF FEDERAL LAW IMPOSING SANCTIONS ON MONETARY TRANSFERS AND BUSINESS WITH THE ISLAMIC REPUBLIC OF IRAN

43.    Between 2009-2012, the parties paid off mortgages on many of the rental properties described in this Complaint, and continued receiving rents from tenants that had leased the homes.

44.    On or about October 26, 2012, without SOBI's knowledge, NEZHAD signed and delivered a promissory note in

the amount of $250,000 Capital Design Homes, LLC and/or its affiliate CDG Homes, LLC, both of which are owned and/or operated by Defendant **MOHAMMAD SEDEHI.**

45.   On October 26, 2012, without **SOBI'S KNOWLEDGE, NEZHAD** signed and delivered to **CAPITAL DESIGN HOMES, LLC** and/or its affiliate **CDG HOMES, LLC** a **"DEED TO SECURE DEBT AND SECURITY AGREEMENT,"** which document purported to give **CAPITAL DESIGN HOMES, LLC** and/or its affiliate **CDG HOMES, LLC** a security interest in the following rental properties that were acquired by **NEZHAD** and **SOBI** during the course of their relationship:

- 1140 Falling Water Drive
  Smyrna, Georgia 30080;

- 1233 Ridgecrest Lane
  Smyrna, Georgia 30080;

- 1700 Cumberland Valley Drive
  Smyrna, Georgia 30080;

- 1720 Cumberland Valley Drive
  Smyrna, Georgia 30080;

- 3006 Patnell Place
  Smyrna, Georgia 30080;

- 2795 Northwood Court, SW
  Marietta, Georgia 30060.

The "Deed to Secure Debt and Security Agreement" was recorded in the records of the Superior Court of Cobb County, Georgia, Bk. No. 14995, pg. 5979-5990.

46.    On October 26, 2012, without **SOBI'S KNOWLEDGE, NEZHAD** signed and delivered to **CAPITAL DESIGN HOMES, LLC** and/or its affiliate **CDG HOMES, LLC** an **"ASSIGNMENT OF LEASES AND RENTS,"** which document purported to assign to **CAPITAL DESIGN HOMES, LLC** and/or its affiliate **CDG HOMES, LLC** "all rents, incomes, issues and profits arising from the Leases and renewals thereof. . .," among other things,  from the aforesaid rental properties that were acquired by **NEZHAD** and **SOBI** during the course of their relationship.  The "Assignment of Leases and Rents" was recorded in the records of the Superior Court of Cobb County, Georgia, Bk. No. 14995, pg. 5991-5999.

47.    At the time that **NEZHAD** signed, and **CAPITAL DESIGN HOMES, LLC** and/or its affiliate **CDG HOMES, LLC** accepted the "Deed to Secure Debt and Security Agreement" and "Assignment of Leases and Rents" and paid Nezhad $250,000, Defendant **MOHAMMAD SEDEHI**, the owner and operator of Defendants **CAPITAL DESIGN HOMES, LLC** and/or its affiliate **CDG HOMES, LLC** was aware that Sobi had and/or claimed an ownership interest in the rental properties that were the subject of the the "Deed to Secure Debt and Security Agreement" and "Assignment of Leases and Rents."

48.    Between October 26, 2012 and January 7, 2013, and unbeknownst to **SOBI**, **NEZHAD** transferred all or substantially all of the $250,000 he received from Defendants **MOHAMMAD SEDEHI** and/or **CAPITAL DESIGN HOMES, LLC** and/or its affiliate **CDG HOMES, LLC** the rental properties to the Islamic Republic of Iran for the purpose of investing in businesses and, more particularly, technology and telecommunications business, in the Islamic Republic of Iran.

49.    Defendants **NEZHAD** and **MOHAMMAD SEDEHI** effectuated the transfer of funds through  informal, professional

financial intermediaries known as "Havaleh," who handle investment, businesses, and the transfer of funds to and from Iran in violation of federal statutes and regulations.

50.    Havaleh, sometimes referred to as "hawala," is an informal value transfer system that involves the use of "money brokers." In a havaleh exchange, an individual will take a sum of money to a havaleh broker to be transferred to a recipient in another location. The havaleh broker then calls another havaleh broker in an area located near the recipient of the money and asks him to take on the debt to be paid to the recipient. In such transactions, no promissory notes or contracts are exchanged; the brokers merely keep a running tally of the debts owed to each other. The informality of the system has made it attractive to some individuals seeking to avoid U.S. economic sanctions against Iran because the transactions occur outside of the purview of banking institutions. Iranians and Iranian expatriates use havaleh to transfer money to and from Iran. As such, large sums of money now flow between Iran and the United States through havaleh in violation of the Currency and Foreign Transactions Reporting Act and various federal

statutes and regulations collectively referred to as the Iranian Transaction Regulations (ITR).[1]

51.   In addition to working and conspiring with Defendant **MOHAMMAD SEDEHI (**and **MOHAMMAD SEDEHI'S** affiliated businesses) to transfer funds to the Islamic Republic of IrAN and using professional havaleh to transfer funds to Iran, **NEZHAD** also uses and conspires with (a) Iranian-based business associates, (b) Iranian-American business associates, and (c) businesses owned and/or operated by or affiliated with him, including, but not limited to Defendant Manda Technology, Inc.

52.   In a conversation audiotaped by **SOBI**, **NEZHAD** admitted to **SOBI** that he transferred money received from the rental properties overseas to Iran, and told her that it was "none of her business" even though she owned the properties jointly and as part of their partnership/relationship and

---

[1]   *Erich Ferrari*, JUST SAY NO: PROHIBITIONS AGAINST HAVALEH BETWEEN THE US AND IRAN, (June 24, 2010). The foregoing paragraph is from a description that can be found at www.paaia.org/CMS/just-say-no-prohibitions-against-havaleh-between-the-us-and-iran1.aspx.

exclusively handled all of the construction, renovations, leasing, and property management for the rental properties.

53.    In another  conversation audiotaped by **SOBI**, a close business associate of Nezhad confirmed that Nezhad had not only transferred money received from the parties' rental properties to the Islamic Republic of Iran, but had encumbered the rental properties with loans from Iranian expatriates and citizens with whom **NEZHAD** was conducting business in Iran. Sobi subsequently confirmed that **NEZHAD** had indeed encumbered the parties' rental properties with loans from Iranian expatriates and citizens with whom **NEZHAD** was conducting business in Iran.

54.    By surreptitiously transferring all or substantially all of the $250,000 to the Islamic Republic of Iran for the purpose of investing in businesses and/or investments in Iran, **NEZHAD** deprived **SOBI** of the money as well as future income from the rental properties.

55.    Defendants **NEZHAD, MOHAMMAD SEDEHI** and **MOHAMMAD SEDEHI'S** affiliated businesses, including but not limited to **CAPITAL DESIGN HOMES, LLC** and/or its affiliate

**CDG HOMES, LLC** willfully violated the Comprehensive Iran Sanctions Accountability and Divestment Act of 2010, U.S. Treasury's Iranian Transactions Regulations set forth at 31 CFR part 560, Iranian Assets Control Regulations Set forth at 31 CFR part 535, Executive Orders 12613, 12957, 12959, and 13059, and various directives issued by the U.S. Treasury Department's Office of Foreign Assets Control.

56.    By surreptitiously transferring money to the Islamic Republic of Iran without reporting the transfers, Defendants **NEZHAD, MOHAMMAD SEDEHI** and **MOHAMMAD SEDEHI'S_** affiliated businesses, including but not limited to **CAPITAL DESIGN HOMES, LLC** and/or its affiliate **CDG HOMES, LLC** violated the Currency and Foreign Transactions Reporting Act and various other laws and regulations requiring the disclosure and reporting of funds transferred overseas to the Islamic Republic of Iran.

57.    In addition to violating the Currency and Foreign Transactions Reporting Act, the Comprehensive Iran Sanctions Accountability and Divestment Act of 2010, U.S. Treasury's Iranian Transactions Regulations by transferring large sums of

money to and from Iran, Defendants **NEZHAD, MOHAMMAD SEDEHI** and **MOHAMMAD SEDEHI'S**_ affiliated businesses, including but not limited to **CAPITAL DESIGN HOMES, LLC** and/or its affiliate **CDG HOMES, LLC** also violated the same laws by investing in and operating a technology/telecommunications and other businesses in the Islamic Republic of Iran directly and through intermediaries.

58.   **NEZHAD** is one of the primary owners and operators of the technology/telecommunications business in the Islamic Republic of Iran, along with ten other owners who live in Iran.

59.   **SOBI** has recently discovered **NEZHAD** identifies himself as the "General Manager" of the business in correspondence to Iran's largest telecommunications provider.

FACTS RELEVANT TO COUNTS I, II, AND II

TITLE II OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT,
18 U.S.C. § 2701(A)(1), THE GEORGIA COMPUTER SYSTEMS
PROTECTION ACT,  GA. CODE ANN. § 16-9-90, AND FOR INVASION
OF PRIVACY

60.    SOBI maintains an Internet and Email account with
Yahoo! Inc., a multinational Internet corporation headquartered
in Sunnyvale, California. Yahoo is widely known for its web
portal, search engine Yahoo! Search, and related services,
including Yahoo! Directory, Yahoo! Mail, Yahoo! News, Yahoo!
Finance, Yahoo! Groups, Yahoo! Answers, advertising, online
mapping, video sharing, fantasy sports and its social media
website.

61.    SOBI's Internet and Email accounts with Yahoo! Inc.
are protected by passwords, software and other methods.

62.    At all times relevant to this action, NEZHAD has
been aware that SOBI maintains Internet and Email accounts
with Yahoo! Inc.

63.    After instituting a legal proceeding for divorce
against NEZHAD, SOBI changed her passwords and took other

reasonable measures to ensure that **NEZHAD** could not access her Internet and Email accounts with Yahoo! Inc.

64.   At all times relevant this action, **NEZHAD** and the **JOHN DOE DEFENDANTS** were aware that **SOBI** had not directly or indirectly authorized or granted **NEZHAD** permission to access her Internet and Email Accounts with Yahoo! Inc.

65.   In fact, **NEZHAD** and the **JOHN DOE DEFENDANTS** were aware that **SOBI**, by deed and words, had prohibited **NEZHAD** from accessing or otherwise using her Yahoo! Inc. Internet and Email accounts as well as any computer or computer network she owned, used, or was authorized to access.

66.   Between January and March, 2013, **NEZHAD,** assisted by various individuals identified in this Complaint as the **"JOHN DOE"** and referred to as the **"JOHN DOE DEFENDANTS"** accessed **SOBI**'s Internet and Email accounts with Yahoo! Inc. for the purpose of obtaining valuable data owned by **SOBI** and relating to (a) various rental properties **SOBI** owned and/or claimed an interest in, (b) **SOBI's** finances,

(c) **SOBI'S** personal and privileged relationships, and (d) **SOBI**'s education and personal records.

67.    **NEZHAD,** assisted by the **"JOHN DOE DEFENDANTS"** maintained surveillance of **SOBI**'s personal, educational, and business-related matters through his unauthorized access.

68.    **NEZHAD,** assisted by the **"JOHN DOE DEFENDANTS"** deleted thousands of email messages in **SOBI**'s Yahoo! Inc. email account in order to interfere with SOBI's ownership of real and personal property and to impair and/or preclude **SOBI** from asserting claims to real and personal property, including, but not limited to  (a) her home, (b) nine rental properties jointly owned by the parties, (c) furniture and other personal property, including, without limitation, valuable and priceless Persian rugs, and (d) documents relating to **NEZHAD**'s immigration fraud and the violation of Iranian Transaction Regulations by  Defendants **NEZHAD, MOHAMMAD SEDEHI** and **MOHAMMAD SEDEHI'S**affiliated businesses, including but not limited to **CAPITAL DESIGN HOMES, LLC** and/or its affiliate **CDG HOMES, LLC.**

69.    After discovering that **NEZHAD,** assisted by the **"JOHN DOE DEFENDANTS"**, had accessed her Yahool! Inc. Internet and Email accounts and deleted thousands of email messages, **SOBI** confirmed with Yahoo! Inc. the "hacking" of her Internet and Email accounts, informing **SOBI** that the "hacking" was far more extensive, and the damage far more substantial than **SOBI** initially discovered.

70.    As a direct result of **NEZHAD'S** actions and those of the the **"JOHN DOE DEFENDANTS,"SOBI** has sustained substantial financial and emotional damage.

### FACTS RELEVANT TO IMMIGRATION FRAUD AND VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO), AND STATE OF GEORGIA RICO

71.    **NEZHAD**'s conduct, and subsequent investigation by Sobi, has revealed that the statements Nezhad made to gain refugee status and admission to the United States were false and known by Nezhad to be false when made by him. For example, Nezhad. . .

    (a)    falsely stated under oath to the United States Government that he had been persecuted and discriminated against by the Iranian Government based on his religion, *i.e.* Mandaean. This statement was false and known to be false when Nezhad made it under oath;

    (b)    falsely stated to the United States Government that the Iranian Government had discriminated and persecuted him by refusing to allow him to work or own a business. Contrary to his statements, the Iranian Government allowed Nezhad to work freely at the occupation of his choice and own a business.

**COUNT I**

**VIOLATION OF 18 U.S.C. 1030**

**THE COMPUTER FRAUD AND ABUSE ACT**

72.    **SOBI** reasserts and incorporates the allegations of paragraphs 1 through 71 of this Complaint as if set forth in this paragraph.

73.    **NEZHAD** and the **JOHN DOE** defendants' actions in accessing, copying and destroying data on **SOBI**'s computer the the data storage facilities directly related to and operating in conjunction with her computer knowing that **SOBI** did not

authorize such access and conduct and during a time in which they knew such access would not have been authorized had they forthrightly informed **SOBI** of their intentions, constitutes a violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.

74.     **NEZHAD** and the **JOHN DOE** defendants' actions in accessing the data for copying were unauthorized.

75.     **SOBI** computer (and the computer system related thereto) is a protected computer in that it is used used in or affecting interstate or foreign commerce or communication to assist in the management and operation of **SOBI**'s businesses, including managing the aforesaid rental properties,  language translation services provided by **SOBI**,   and medical transcription services.

76.     **NEZHAD** and the **JOHN DOE** defendants acted knowingly and with intent to defraud **SOBI** as that phrase is defined in the statute, and obtained a thing of value, namely **SOBI**'s data  and other valuable confidential and proprietary information and files.

77.   **SOBI** has suffered losses by reason of these violations in excess of $5,000 in less than a one-year period of time.

78.   **SOBI**'s losses include the costs in connection with the retention of forensic experts to conduct a damage assessment and identify and determine the extent of **NEZHAD** and the **JOHN DOE** defendants' misconduct, including without limitation their misappropriation of and/or damage to **SOBI** 's electronic data, and the costs that will be incurred to remedy the violation.

79.   **SOBI** is entitled to an award of compensatory damages from **NEZHAD** and the **JOHN DOE** defendants' violations.

**COUNT** II

**VIOLATION OF 18 U.S.C. § 2701(A)(1)**

**TITLE II OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**

80.   **SOBI** reasserts and incorporates the allegations of paragraphs 1 through 79 of this Complaint as if set forth in this paragraph.

81.   **NEZHAD** and the **JOHN DOE** defendants' actions in accessing, copying and destroying data —including over 1,000 emails— on **SOBI**'s computer and the data storage facilities directly related to and operating in conjunction with her computer knowing that **SOBI** did not authorize such access and conduct and during a time in which they knew such access would not have been authorized had they forthrightly informed **SOBI** of their intentions, constitutes a violation of The Stored Communications Act, as incorporated in Title II of the Electronic Communications Privacy Act ("CFAA"), 18 U.S.C. § 2701 *et seq.*

82.   **NEZHAD** and the **JOHN DOE** defendants' actions in accessing the emails and data for copying were unauthorized.

83.   **SOBI** computer (and the computer system related thereto) is a protected computer in that it is used used in or affecting interstate or foreign commerce or communication to assist in the management and operation of **SOBI**'s businesses, including managing the aforesaid rental properties, language translation services provided by **SOBI**, and medical transcription services.

84.   **NEZHAD** and the **JOHN DOE** defendants intentionally accesses without authorization a facility through which an electronic communication service is provided and thereby obtained, altered and destroyed wire and/or electronic communications that were in electronic storage. In addition, said defendants prevented authorized access to wire or electronic communications while they were in electronic storage.

85.   **SOBI** has suffered losses by reason of these violations in excess of $5,000 in less than a one-year period of time.

86.   **SOBI**'s losses include loses relating to her real estate and/or interest in real estate, loses relating to her other businesses and medical school education as well as the costs in connection with the retention of forensic experts to conduct a damage assessment and identify and determine the extent of **NEZHAD** and the **JOHN DOE** defendants' misconduct, including without limitation their misappropriation of and/or damage to **SOBI** 's electronic data, and the costs that will be incurred to remedy the violation.

87.     Pursuant to 18 U.S.C. 2707(b)(1)-(3), **SOBI** is entitled to recover from **NEZHAD** and the **JOHN DOE** defendants

(a)     such preliminary and other equitable or declaratory relief as may be appropriate;

**(b)**     actual damages suffered by her, profits made by **NEZHAD** and the **JOHN DOE** defendants as a result of the misappropriation and destruction of emails and other data, together with punitive damages;

**(c)**     a reasonable attorney's fee and other litigation costs reasonably incurred.

## COUNT III

### VIOLATION OF GA. CODE ANN. § 16-9-90
### GEORGIA COMPUTER SYSTEMS PROTECTION ACT

88.     **SOBI** reasserts and incorporates the allegations of paragraphs 1 through 87 of this Complaint as if set forth in this paragraph.

89.     **NEZHAD** used a computer or computer network with knowledge that each use was without authority.

90.     **NEZHAD** used the computer or computer network with the intention of:

    i.    Deleting and/or removing, either temporarily or permanently, **SOBI**'s data from the computer or computer network; and

    ii.    Obstructing, interrupting, and/or interfering with the use of a computer program or data; and

    iii.    Altering, damaging, or in any way causing the malfunction of a computer, computer network, or computer program;

91.   **NEZHAD** used the computer or computer network with the intention of examining **SOBI**'s employment, medical, salary, credit, and/or other financial or personal data relating with knowledge that said examination was without authority.

92.   **NEZHAD** used the computer or computer network with the intention of

    i.    Taking or appropriating property belonging in whole or in part to **SOBI**; and

    ii.    Obtaining **SOBI**'s property by deceitful means and/or artful practice; and

    iii.    Converting **SOBI**'s property to his use in violation of a known legal obligation to account for and/or a known legal obligation to make a disposition of said property.

93.   As a direct and proximate result of **NEZHAD'S** misconduct, **SOBI** has suffered damages, including without limitation, loss of profits and other expenditures, including, but not limited to the services of expert computer security consultants as well as attorneys' fees and other litigation expenses.

## COUNT IV

### INVASION OF PRIVACY

94.   **SOBI** reasserts and incorporates the allegations of paragraphs 1 through 93 of this Complaint as if set forth in this paragraph.

95.   The conduct in which Defendants engaged, as described above, constituted an affront to **SOBI**'s personal dignity and an intrusion of **SOBI**'s solitude and private affairs.

96.   As a direct and proximate result of the Defendants' actions, **SOBI** has suffered damages, which she is entitled to recover from Defendants.

97.     The Defendants' invasion of privacy caused, and will continue to cause, **SOBI** mental anguish depression, anxiety, loss of enjoyment of life, and other non-pecuniary losses for which she is entitled to recover.

98.     **SOBI** is entitled to recover from the Defendant's general (compensatory and special) damages together with punitive damages, and other legal and equitable relief, as this Court deems just and appropriate.

## COUNT V

## FRAUD

99.     **SOBI** reasserts and incorporates the allegations of paragraphs 1 through 98 of this Complaint as if set forth in this paragraph.

100.    This is a claim for fraud in the inducement and/or promissory fraud by **SOBI** against Defendants **NEZHAD, CAPITAL DESIGN HOMES, LLC, CDG HOMES, LLC.,** and **MOHAMMAD SEDEHI.**

101.    **NEZHAD**'s statements, as set forth in this Complaint, were false when made and known to be false by **NEZHAD** when

made to **Sobi**. Alternatively, **Nezhad** never had or formed a present intention to honor the statements made by him to **Sobi**.

102. **Nezhad's** statements to **Sobi** regarding the acquisition of real and personal property and the ownership thereof were false when made to **Sobi** and known by **Nezhad** to have been false when he made them to **sobi.**

103. **Nezhad's** representations made to **Sobi** were material in that **Sobi** would not have agreed to marry **Nezhad**, sponsor his application for immigration and/or citizenship, acquire real and personal property with **Nezhad** or engage in intimate relations with **Nezhad**.

104. As a direct result of **Nezhad's** false representations, Sobi has suffered economic and emotional harm for which she is entitled to recover from **Nezhad**.

105. Defendants **Capital Design Homes, LLC, CDG Homes, LLC,** and **Mohammad Sedehi** conspired with **Nezhad** to perpetrate fraud against **Sobi** with respect to the encumbrances placed on the rental properties and income from the rental properties. At all times relevant to this action, **Capital Design Homes, LLC, CDG Homes, LLC,** and

**MOHAMMAD SEDEHI** were aware that **SOBI** had or claimed an ownership interest in the rental properties and income therefrom when the transfers and/or encumbrances were made and/or recorded.

## COUNT VI

### BREACH OF FIDUCIARY DUTY

106.   **SOBI** reasserts and incorporates the allegations of paragraphs 1 through 105 of this Complaint as if set forth in this paragraph.

107.   At all times relevant to this Complaint, **NEZHAD** had a fiduciary duty to **SOBI**.

108.    **NEZHAD** breached his fiduciary duty to **SOBI**.

109.   **SOBI**i has suffered damages that were actually and proximately caused by **NEZHAD**'s Breach of Fiduciary duty.

## COUNT VII

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)

110.  **SOBI** reasserts and incorporates the allegations of paragraphs 1 through 109 of this Complaint as if set forth in this paragraph.

111.  This **RICO** claim is brought against **NEZHAD** with respect to all predicate acts, and against Defendants **NEZHAD, CAPITAL DESIGN HOMES, LLC, CDG HOMES, LLC.,** and **MOHAMMAD SEDEHI** with respect to the predicate acts involving violations of the Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5311 and mail and wire fraud, 18 U.S.C. §§ 1341, 1343.

## Enterprise Allegations

112.  Defendants course of conduct, described in the foregoing allegations, constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

## Predicate Acts/Racketeering Activity

113.   Defendants committed the following "predicate acts" set forth in  18 U.S.C. § 1961(1):

(a)   **CURRENCY AND FOREIGN TRANSACTIONS REPORTING ACT.** Defendants acts and conduct as set forth above constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(E) because Defendants committed or attempted to commit violations that are indictable under the  Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5311 *et seq;*

(b)   **MAIL AND WIRE FRAUD**.  Defendants acts and conduct as set forth above constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) because Defendants committed or attempted to violate 18 U.S.C. §§ 1341, 1343 (relating to mail and wire fraud);

(c)   **PROCUREMENT OF CITIZENSHIP OR NATURALIZATION UNLAWFULLY.** Defendants acts and conduct as set forth above constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) because Defendants committed or attempted to commit violations that are indictable under 18 U.S.C. § 1425 (relating to the procurement of citizenship or

nationalization unlawfully) and 18 U.S.C. § 1546 (relating to fraud and misuse of visas, permits, and other documents).

114. Defendants conduct as set forth above constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) because Defendants' racketeering activity consisted of two or more violations of the aforementioned statutes, all of which occurred within ten years after commission of a prior act of racketeering activity.

115. Through the unlawful actions set forth herein, Defendants have engaged in a pattern of racketeering activity to acquire, maintain and benefit from an enterprise.

## Acquisition of Money and Property

116. In violation of 18 U.S.C. § 1962(a) Defendants acquired rental property income, other funds, and real property through the pattern of racketeering activity described in this Complaint.

## Actual and Proximate Cause

117. **SOBI** has been injured as a direct result of Defendants violations of 18 U.S.C. § 1961 *et seq*. and have suffered actual damages, prior to trebling of damages, in an

amount to be proven at trial. Specifically, **SOBI** has been deprived of (a) rental property income, (b) real property in the form of the rental properties taken by defendants, (c) funds and labor expended by **SOBI** on the rental properties, (d) funds expended by **SOBI** on Defendant **NEZHAD**'s immigration and naturalization, and (e) mental anguish suffered by **SOBI**, including, but not limited to funds expended by **SOBI** to treat depression, anxiety, and humiliation.

## Treble Damages

118.   Under 18 U.S.C. § 1964(c), **SOBI** is entitled to threefold the amount of any actual monetary damages they have incurred as a result of Defendants' pattern of racketeering activity.

## Attorneys' Fees and Costs of Litigation

119.   Under 18 U.S.C. § 1964(c), **SOBI** is entitled to recover attorneys' fees and other costs from Defendants in an amount to be proven in accordance with Rule 54, F.R.CIV.P.

## Punitive Damages

120.   The acts and conduct by Defendants as set forth above constitute willful misconduct and fraud, and were done

with an entire want of care such as to raise the presumption of conscious indifference to consequences. Accordingly, SOBI are entitled to recover punitive damages pursuant to 18 U.S.C. § 1964(c).

**COUNT VIII**

**GEORGIA RICO**

121.  SOBI reasserts and incorporates the allegations of paragraphs 1 through 120 of this Complaint as if set forth in this paragraph.

122.  This Georgia **RICO** claim is brought against **NEZHAD** with respect to all predicate acts, and against Defendants **NEZHAD, CAPITAL DESIGN HOMES, LLC, CDG HOMES, LLC,** and **MOHAMMAD SEDEHI** with respect to the predicate acts involving violations of the Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5311 and mail and wire fraud, 18 U.S.C. §§ 1341, 1343.

123.  Defendants course of conduct, described in the foregoing allegations, constituted an "enterprise" within the meaning of GA. CODE ANN. § 16-14-3(6).

124.  Defendants acts and conduct as set forth above constitute "racketeering activity" within the meaning of GA. CODE ANN. § 16-14-3 because Defendants committed or attempted to commit violations of numerous statutes set forth in 18 U.S.C. § 1961(1).

125.  Defendants conduct as set forth above constitutes a pattern of racketeering activity within the meaning of GA. CODE ANN. § 16-14-3(8) because Defendants' racketeering activity consisted of two or more violations of violations of numerous statutes set forth in 18 U.S.C. § 1961(1), and the last of said violations occurred within four years after commission of a prior act of racketeering activity.

126.  Through the unlawful actions set forth herein, Defendants have engaged in a pattern of racketeering activity to acquire, maintain and benefit from an enterprise.

127.  In violation of GA. CODE ANN.§ 16-14-4(a) Defendants acquired income and property through the pattern of racketeering activity described in this Complaint.

128.  **SOBI** has been injured as a direct result of Defendants violations of GA. CODE ANN.§ 16-14-1 et seq. and

have suffered actual damages, prior to trebling of damages, in an amount to be proven at trial.

129.    Under GA. CODE ANN.§ 16-14-6(c), **SOBI** is entitled to threefold the amount of any actual monetary damages she has incurred as a result of Defendants' pattern of racketeering activity.

130.    Under GA. CODE ANN. § 16-4-6(c), **SOBI** is entitled to recover attorneys' fees and other costs from Defendants in an amount to be proven motion under this statute and Rule 54, F.R.Civ.P.

131.    The acts and conduct by Defendants as set forth above constitute willful misconduct and fraud, and were done with an entire want of care such as to raise the presumption of conscious indifference to consequences. Accordingly, **SOBI** is entitled to recover punitive damages pursuant to GA. CODE ANN. § 16-14-6(c).

## COUNT IX

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

132.  **SOBI** reasserts and incorporates the allegations of paragraphs 1 through 131 of this Complaint as if set forth in this paragraph.

133.  This claim for intentional infliction of emotional distress is brought against Defendants **NEZHAD, CAPITAL DESIGN HOMES, LLC, CDG HOMES, LLC,** and **MOHAMMAD SEDEHI.**

134.  The offensive conduct to which **SOBI** was subjected as described above was so outrageous as to naturally give rise to such intense feeling of humiliation, embarrassment, fright, and extreme outrage as to cause severe emotional distress.

135.  The Defendants' intentional infliction of emotional distress caused, and will continue to cause, **SOBI** mental anguish, depression, anxiety, loss of enjoyment of life, and other non-pecuniary losses. In addition thereto, Defendants' actions have diminished **SOBI**'s ability to work and interfered with her medical school education.

136.   As a direct and proximate result of the Defendants' actions, **SOBI** has suffered lost wages and employment benefits, income, real and personal property, among other things.

137.   As a direct and proximate result of the Defendants' actions, **SOBI** has suffered emotional harm for which she is entitled to recover compensatory and punitive damages from the Defendants.

## COUNT X

## FRAUDULENT CONVEYANCE

138.   **SOBI** reasserts and incorporates the allegations of paragraphs 1 through 137 of this Complaint as if  set forth in this paragraph.

139.   This is a claim for fraudulent conveyance by **SOBI** against Defendants **NEZHAD, MANDA TECHNOLOGY, INC., CAPITAL DESIGN HOMES, LLC, CDG HOMES, LLC,** and **MOHAMMAD SEDEHI.**

140.   **NEZHAD'S'** transfer of the real and personal property or and the obligations incurred by **NEZHAD** are fraudulent as to **SOBI.**

141.  Defendants **NEZHAD, MANDA TECHNOLOGY, INC., CAPITAL DESIGN HOMES, LLC, CDG HOMES, LLC.,** and **MOHAMMAD SEDEHI**    made the aforementioned transfers and/or created the obligations described in this complaint with actual intent to hinder, delay, or defraud **SOBI.**

142.  The following factors apply to the transfer of real and personal property and the obligations, i.e. encumbrances placed on the real and personal in which **SOBI** has an interest:

a.      The transfer or obligation was to an insider;

b.      Defendants retained possession or control of the property transferred after the transfer;

c.      The transfer and obligations were concealed at the time they were made or incurred;

d.      Before the transfer was made or obligation was incurred, Nezhad had been sued or threatened with suit by Sobi;

e.      Defendants removed or concealed assets;

f. Nezhad transferred the essential assets of the business to a lienor who transferred the assets to an insider.

143. As a result of the fraudulent transfers and obligations, **SOBI** is entitled to:

- Judgment avoiding and voiding the transfers and obligations and, particularly, cancellation or an order directing Defendants to cancel the "Deed to Secure Deed and Security Agreement," and "Assignment of Leases and Rents" that Nezhad executed and Defendants filed with the Superior Court of Cobb County, Georgia on October 26, 2012;

- Judgment against Defendants, jointly and severally, for the value of the real and personal property that was fraudulently transferred and/or encumbered by Defendants;

- A preliminary and permanent injunction prohibiting the Defendants preventing further disposition or transfer of the properties described in this complaint;

- A preliminary and permanent from transferring and/or encumbering real and personal property in which Sobi has an interest;

- Attachment against the real and personal property described in this Complaint;

- Reasonable costs and attorneys' fees together with such other, further and different relief the circumstances may require.

## COUNT XI

### LEGAL AND EQUITABLE ACCOUNTING

144. **SOBI** reasserts and incorporates the allegations of paragraphs 1 through 143 of this Complaint as if set forth in this paragraph.

145. This is a claim for a legal and/or equitable accounting by **SOBI** against Defendants **NEZHAD, MANDA TECHNOLOGY, INC., CAPITAL DESIGN HOMES, LLC, CDG HOMES, LLC,** and **MOHAMMAD SEDEHI.**

146. **SOBI** is entitled to a legal and/or equitable accounting of all real and personal property Defendants

misappropriated, transferred, and/or encumbered in contravention of her ownership interests.

## COUNT XII

### CONSTRUCTIVE TRUST

147.  **SOBI** reasserts and incorporates the allegations of paragraphs 1 through 146 of this Complaint as if  set forth in this paragraph.

148.  This is a claim for imposition of a constructive trust in favor of **SOBI** and against Defendants **NEZHAD, MANDA TECHNOLOGY, INC., CAPITAL DESIGN HOMES, LLC, CDG HOMES, LLC,** and **MOHAMMAD SEDEHI.**

149.  **SOBI** is entitled to an equitable decree imposing a constructive trust on all real and personal property Defendants misappropriated, transferred, and/or encumbered in contravention of her ownership interests.

## COUNT XIII

## PUNITIVE DAMAGES

150.   **SOBI** reasserts and incorporates the allegations of paragraphs 1 through 149 of this Complaint as if  set forth in this paragraph.

151.   Defendants showed blatant and willful disregard for   **SOBI**'s   well-being,   acted   maliciously,   recklessly,   and deliberately intended to harm **SOBI**.

152.   As  a  direct  and  proximate  result  of  Defendants' actions, **SOBI** has suffered emotional harm and is entitled to recover  punitive  damages  in  an  amount  to  be  determined  at trial.

## COUNT XIV

## ATTORNEYS' FEES

153.   **SOBI** reasserts and incorporates the allegations of paragraphs 1 through 152 of this Complaint as if set forth in this paragraph.

154.  Defendants actions have been in bad faith, have been stubbornly litigious and have caused unnecessary trouble and expense so as to justify an award of **Sobi**'s reasonable attorneys' fees and expenses of litigation.

28 March 2013.

By: **Stephen M. Katz**
Ga Bar No. 409065



THE **Katz Law Group** LLC
4799 Olde Towne Parkway
Marietta, Georgia 30068-4350
Telephone:   770.988.8181
Fax:             770.988.8182
EMail:  smkatz@smk–law.com